Filed 3/29/16  Cottonwood Capital Property Management v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COTTONWOOD CAPITAL PROPERTY MANAGEMENT II, LLC,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>NNN CENTURY HILLS TIC 01, LLC, et al.<br><br>    Real Parties in Interest. | G052620<br><br>(Super. Ct. No. 30-2014-00764027)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Peter J. Wilson, Judge.  Petition granted.

Shumener, Odson & Oh, Betty M. Shumener, Henry H. Oh and Edward O. Morales for Petitioner.

No appearance for Respondent.

Engstrom, Lipscomb & Lack, Walter J. Lack and Steven C. Shuman for Real Parties in Interest.

\* \* \*

Petitioner Cottonwood Capital Property Management II, LLC (Cottonwood) petitions for a writ of mandate directing the trial court to grant Cottonwood's motion to quash service of summons for lack of personal jurisdiction. Real parties in interest NNN Century Hills TIC 01, LLC through NNN Century Hills TIC 28, LLC (collectively, Owners) are 28 limited liability companies that contracted with Daymark Realty Properties, Inc. (Daymark) to manage an apartment complex Owners bought in Georgia. A few years later, Daymark entered into a subcontract with Cottonwood to have it manage the apartments for Daymark.

Owners filed this action against Cottonwood and Daymark after Owners' lender foreclosed on the apartments because Cottonwood stopped making payments on Owners' purchase money loan. According to Cottonwood, it stopped making loan payments because the apartments did not generate sufficient revenue to pay the operating expenses and service Owners' loan, and Owners refused to comply with Cottonwood's "capital call" seeking additional funds to cover the expenses and loan payments. Owners alleged claims for breach of the subcontract, breach of the original property management agreement, and various torts. Cottonwood moved to quash service, arguing it had not purposefully availed itself of any California benefits by entering into and performing the subcontract, and therefore it lacked sufficient minimum contacts with California to constitutionally allow the state's courts to exercise personal jurisdiction over it.

We agree and grant the petition. Cottonwood is a Utah limited liability company with its principal place of business in Utah. It has no offices, employees,

2

agents, or assets in California and conducts no business in the state. Daymark and Cottonwood negotiated and executed the subcontract in Utah, and Cottonwood had no direct contractual relationship with Owners. Cottonwood performed the subcontract in Georgia where the apartments were located and in Utah where its offices were located. Cottonwood did not engage in any activities in California relative to the subcontract.

Cottonwood's California connections were limited to sending budgets, plans, reports, miscellaneous communications, and the capital call to a subset of Owners that had members living in California. These same connections also existed with the 12 other states where Owners' members lived. Cottonwood did not seek out these connections with California, which were incidental to Cottonwood's performance under the subcontract in Georgia and Utah. As explained below, we conclude these California connections are too attenuated and random to constitute purposeful availment, and therefore may not support the exercise of personal jurisdiction over Cottonwood.

I

FACTS AND PROCEDURAL HISTORY

Owners are 28 limited liability companies that purchased a 200-unit apartment complex in Augusta, Georgia, and held title to the apartments as tenants in common. Owners were formed in Delaware for the sole purpose of purchasing the apartments; they conducted no other business and each Owner's only asset was its interest in the apartments. The members of each Owner were individuals, couples, or family trusts that lived in 13 states, with the members of 10 Owners living in California.[1] None of Owners' members are parties to the underlying action.

---

[1] The 13 states where Owners' members lived are Arizona, California, Colorado, Connecticut, Florida, Idaho, Nebraska, New Jersey, North Carolina, Tennessee, Virginia, Washington, and Wyoming.

3

Owners financed the purchase of the apartments with a nearly $16 million loan secured by a deed of trust and security agreement. In the loan documents, Owners agreed Georgia law would govern any dispute relating to the loan and also agreed to submit to personal jurisdiction in Georgia to resolve any dispute.

Daymark is a California corporation with its principal place of business in Orange County, California. In June 2007, Daymark's predecessor in interest entered into the "Property Management Agreement" (Management Agreement) with Owners to "manage, lease, operate, and maintain the [apartments]."[2] The Management Agreement designated Daymark as "the sole and exclusive manager of the [apartments] to act on behalf of [Owners]" and required Daymark to "keep the [apartments] clean and in good repair, . . . order and supervise the completion of such repairs as may be required and . . . generally do and perform, or cause to be done or performed, all things necessary, required or desirable for the proper and efficient management, operation, and maintenance of the [apartments]."

Daymark's responsibilities under the Management Agreement included leasing the individual units, collecting rent, paying the mortgage, taxes, and other bills, repairing and maintaining the apartments, interacting with the tenants, preparing an annual operating budget and plan for Owners' approval, providing Owners with quarterly financial reports, establishing separate bank accounts for each Owner's share of the profits, and maintaining books and records of the income and expenses attributed to each Owner's interest in the apartments at Daymark's office in California. The Management Agreement authorized Daymark, "in its sole discretion, to subcontract some or all of the property management functions described herein to local property managers and certain other parties." Finally, the Management Agreement included a choice-of-law provision

---

[2] Triple Net Properties Realty, Inc., was the entity that contracted with Owners and later became Daymark through a series of mergers and other transactions. Triple Net Properties Realty is not a party to the underlying action.

4

designating Georgia law, but it required arbitration in Orange County, California, for all disputes relating to the Management Agreement.

Cottonwood is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. In 2012, representatives of Cottonwood attended a conference in California where they met Daymark's representatives. This chance encounter led to two separate meetings in California when Cottonwood representatives were attending other conferences. During these California meetings, Cottonwood described its property management services and Daymark shared information about the various portfolios of properties it held and managed. The two companies did not discuss the terms of any particular deal during these meetings, but rather simply got to know each other's business.

After the California meetings, Daymark and its attorneys traveled to Utah to meet with Cottonwood. The two companies negotiated, drafted, and agreed to an arrangement for Cottonwood to purchase the right to manage various properties Daymark managed, including the apartments in Georgia. In November 2012, Cottonwood and Daymark entered into the "Sub-Property Management Agreement" (Subcontract) for Cottonwood to perform Daymark's property management responsibilities for the apartments.

The Subcontract provides, "[Daymark] hereby hires and retains [Cottonwood], and [Cottonwood] agrees to perform all of [Daymark's] property management obligations under the Management Agreement, subject to the exclusions, terms and conditions contained in this Subcontract (collectively, the 'Services'). It is expressly understood that the Services are to be provided on a subcontract basis and that this Subcontract does not constitute an assignment of the Management Agreement or any right, title, or interest thereunder." In exchange for Cottonwood performing Daymark's property management obligations, Daymark agreed to "assign[] to [Cottonwood] [Daymark's] rights to payment of the Management Fee and the Construction

5

Management Fee and will instruct [Owners] to pay the Management Fee and the Construction Management Fee directly to an account designated by [Cottonwood]."

In the Subcontract, "[Cottonwood] covenants and warrants that it fully understands and agrees to be subject to, bound by and fully perform all of [Daymark's] covenants, agreements, terms, provisions and conditions of the Management Agreement arising as of the date hereof, except (i) as such terms, covenants, agreements and provisions are specifically modified, excluded or limited by this Subcontract . . . ." The Subcontract further provides it "is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to [Owners] or to any person or entity as a third party beneficiary or otherwise." Finally, the Subcontract includes a choice-of-law provision designating Delaware law, but it does not include a forum selection or arbitration clause.

After a brief transition period, Cottonwood performed the day-to-day management and maintenance services for the apartments through its onsite employees and contractors, who were supervised by a regional manager located in Georgia. Financial and other information relating to the apartments was compiled in Georgia and transmitted to Cottonwood's corporate offices in Utah, where Cottonwood analyzed the information and prepared budgets, plans, reports, and other documents concerning the apartments. Cottonwood stored this information in an online database it maintained in Utah. It provided Owners with login information to access the database and also mailed hard copies of these documents to Owners who requested them. Cottonwood provided notice to Owners about the budgets and reports through e-mail and standard mail from its offices in Utah. It also conducted regular conference calls to discuss its management, and provided Owners with the information necessary to participate in the calls or listen to recordings of previous calls. The calls were initiated from Cottonwood's offices in Utah.

Cottonwood experienced difficulties managing the apartments because they did not generate sufficient revenue to pay the operating expenses and service Owners'

6

property loan. Initially, Cottonwood maintained the apartments by obtaining necessary services on credit and only paying for those services as they came due, but eventually payment demands exceeded the available revenue. Cottonwood therefore made a capital call on all Owners, seeking the additional funds necessary to pay the outstanding bills while continuing to service the debt for the apartments. When Owners refused to comply with the capital call, Cottonwood lacked the funds necessary to pay the outstanding obligations, including the loan on the apartments. After Owners missed several loan payments, the lender foreclosed.

In 2014, Owners brought this action against Cottonwood and Daymark. The operative first amended complaint alleged claims against Cottonwood for breach of the Subcontract, breach of fiduciary duty, accounting, inducing breach of or intentional interference with the loan on the apartments, intentional interference with prospective economic relations, and negligent interference with prospective economic relations.[3] Owners alleged Cottonwood mismanaged the apartments and caused the foreclosure by paying certain operating expenses before paying the loan on the apartments, failing to maintain the debt service coverage ratio required by the loan, failing to timely provide the annual operating budget and other financial reports, incurring unauthorized expenses, failing to maintain required state and local licenses, failing to make financial and other documents available to Owners, and making an unauthorized capital call.

Owners served the summons and first amended complaint on Cottonwood's agent for service of process in Delaware, and Cottonwood responded by moving to quash service. Cottonwood argued it lacked sufficient minimum contacts with California to

_____

[3]      The first amended complaint also alleged claims against Owners' lender for breach of the implied covenant of good faith and fair dealing, negligence, intentional interference with prospective economic relations, negligent interference with prospective economic relations, and wrongful foreclosure. The lender is not a party to this writ proceeding.

7

constitutionally subject it to personal jurisdiction in the state because Cottonwood negotiated and entered into the Subcontract with Daymark in Utah to manage the apartments in Georgia and the alleged acts and omissions by Cottonwood occurred in either Georgia or Utah.  Owners opposed the motion, arguing the totality of the circumstances surrounding the Management Agreement and the Subcontract established sufficient minimum contacts with California because Daymark is a California corporation, Cottonwood assumed Daymark's obligations under the Management Agreement, and the Management Agreement required certain obligations to be performed in California, including making financial and certain other documents relating to the apartments available to Owners, providing budgets and financial reports to Owners' members, and arbitrating any disputes under the Management Agreement.[4]

The trial court agreed with Owners and denied Cottonwood's motion to quash.  Cottonwood timely petitioned for writ relief.  (Code Civ. Proc., § 418.10, subd. (c).)  We invited informal opposition, and after reviewing that opposition, we issued an order to show cause why a writ of mandate should not issue ordering the court to vacate its order denying Cottonwood's motion to quash and enter a new order granting the motion.  After further briefing and oral argument, we now address the petition's merits.

---

[4] Owners moved to augment the record with (1) pages from a deposition transcript they cited to the trial court, but inadvertently failed to file with the court, and (2) pages from a separate deposition transcript they neither cited nor filed with the trial court.  We deny the motion.  "[T]he record cannot be 'augmented' with material that was not before the trial court."  (*In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1209.)  Nonetheless, considering those materials would not change our analysis or conclusions.

8

II

DISCUSSION

A. *Personal Jurisdiction Governing Principles*

"'California courts may exercise personal jurisdiction on any basis consistent with the Constitution of California and the United States. [Citation.] The exercise of jurisdiction over a nonresident defendant comports with these Constitutions "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate '"traditional notions of fair play and substantial justice."''"'" (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1061 (*Snowney*).)

"'The concept of minimum contacts . . . requires states to observe certain territorial limits on their sovereignty. It "ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."' [Citations.] To do so, the minimum contacts test asks 'whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.'" (*Snowney*, *supra*, 35 Cal.4th at p. 1061.)

"Under the minimum contacts test, '[p]ersonal jurisdiction may be either general or specific.'" (*Snowney*, *supra*, 35 Cal.4th at p. 1062.) "A nonresident defendant may be subject to the *general* jurisdiction of the forum if his or her contacts in the forum state are 'substantial . . . continuous and systematic.' . . . Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445-446.) Owners concede there is no basis for general jurisdiction over Cottonwood in California, and therefore we focus on specific personal jurisdiction.

"'When determining whether specific jurisdiction exists, courts consider the "'relationship among the defendant, the forum, and the litigation.'" [Citations.] A

9

court may exercise specific jurisdiction over a nonresident defendant only if: (1) "the defendant has purposefully availed himself or herself of forum benefits" [citation]; (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum'" [citations]; and (3) "'the assertion of personal jurisdiction would comport with "fair play and substantial justice."'"" (*Snowney*, *supra*, 35 Cal.4th at p. 1062.)

"Where a nonresident defendant challenges jurisdiction by way of a motion to quash, the plaintiff bears the burden of establishing by a preponderance of the evidence that minimum contacts exist between the defendant and the forum state to justify imposition of personal jurisdiction. [Citations.] The plaintiff must present facts '"demonstrating that the conduct of defendants related to the pleaded causes [of action] is such as to constitute constitutionally cognizable 'minimum contacts.'"'" (*Elkman v. National States Ins. Co.* (2009) 173 Cal.App.4th 1305, 1312-1313 (*Elkman*).) "'If the plaintiff meets this initial burden, then the defendant has the burden of demonstrating "that the exercise of jurisdiction would be unreasonable."'" (*Snowney*, *supra*, 35 Cal.4th at p. 1062; see *Greenwell v. Auto-Owners Ins. Co.* (2015) 233 Cal.App.4th 783, 792 (*Greenwell*).)

"'On review, the question of jurisdiction is, in essence, one of law. When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, we review independently the trial court's conclusions as to the legal significance of the facts. [Citations.] When the jurisdictional facts are not in dispute, the question of whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo. [Citation.]' [Citations.] The ultimate issue of whether an exercise of jurisdiction is fair and reasonable is a legal determination subject to de novo review on appeal." (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568 (*Aquila*).)

B.      *California Lacks Specific Personal Jurisdiction Over Cottonwood*

1.      The Purposeful Availment Requirement

"""The purposeful availment inquiry . . . focuses on the defendant's intentionality.  [Citation.]  This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on" [its] contacts with the forum.'" (*Snowney*, *supra*, 35 Cal.4th at pp. 1062-1063.) """'Purposeful availment' requires that the defendant 'have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'""" (*Stone v. State of Texas* (1999) 76 Cal.App.4th 1043, 1048 (*Stone*).)

"'Thus, the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts [citations], or of the 'unilateral activity of another party or a third person.'""" (*Elkman*, *supra*, 173 Cal.App.4th at p. 1317, italics omitted.)  "Instead, the defendant will only be subject to personal jurisdiction if '"it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state."'" (*Snowney*, *supra*, 35 Cal.4th at p. 1063.)

"'For purposes of the purposeful availment prong, the ". . . United States Supreme Court has described the forum contacts necessary to establish specific jurisdiction as involving *variously* a nonresident who has 'purposefully directed' his or her activities at forum residents [citation], *or* who has 'purposefully derived benefit' from forum activities [citation], *or* '"purposefully avail[ed himself or herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,"'" *or* """deliberately" has engaged in significant activities with a State [citation] *or* has created "continuing obligations" between himself and residents of the forum [citation].'" [Citation.]  This disjunctive language, along with the Supreme

11

Court's rejection of mechanical or "'talismanic'" formulas [citation], suggests that the above formulations describe *alternative*, but not mutually exclusive, tests for purposeful availment.' [Citation.] Courts must make the necessary assessment 'on a case-by-case basis, focusing on the *nature and quality* of the defendant's activities in the state or with state residents.'" (*Greenwell*, *supra*, 233 Cal.App.4th at pp. 792-793.)

*Elkman* illustrates that simply having contacts with California or receiving some benefits from the state is not enough to establish purposeful availment. The nonresident defendant must intentionally and voluntarily establish the requisite contacts with California. In *Elkman*, a nonresident insurer issued a long-term care policy to the plaintiff when she lived in Florida. Consistent with Florida law, the policy included a guaranteed renewal provision for the life of the plaintiff. A few years later, the plaintiff moved to California, and from there she renewed the policy and continued to pay the premiums. While still in California, the plaintiff made a claim under the policy. The insurer paid for six months of care, but refused to pay for any further care based on the policy's terms. When the plaintiff sued in California to challenge the insurer's policy interpretation, the insurer moved to quash service for lack of personal jurisdiction. (*Elkman*, *supra*, 173 Cal.App.4th at pp. 1309-1310.)

The insurer presented evidence showing it was a Missouri corporation that had never been licensed or authorized to do business in California, it maintained no office or bank account in California, it had no agents licensed to sell its products in California, and it never had advertised, applied for approval to issue insurance, or issued insurance in California. In opposition, the plaintiff presented evidence showing the insurer had nearly 400 insureds who lived in California and the insurer received premiums, processed claims, and paid claims from those insured. In reply, the insurer presented evidence showing these insureds moved to California after obtaining their policies and the insurer did not intentionally direct any activity toward California. (*Elkman*, *supra*, 173 Cal.App.4th at pp. 1310-1312.)

12

The trial court granted the motion to quash service and the *Elkman* court affirmed, explaining "we conclude that [the insurer] did not subject itself to specific jurisdiction in California merely by accepting premium payments from California and by processing and paying claims submitted by its insureds for services rendered in this state. [The insurer] did not 'come here' voluntarily, no matter how many insureds did. It was the unilateral decisions of [the plaintiff] and other insureds to relocate to California which caused [the insurer] to accept payments from this state and to process and pay claims for services rendered in this state. These circumstances do not support a finding [the insurer] purposefully availed itself of forum benefits so as to make it subject to specific jurisdiction in California." (*Elkman*, *supra*, 173 Cal.App.4th at p. 1321.)

*Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221 (*Edmunds*), illustrates that a nonresident's activities in California and directed toward the state do not establish purposeful availment if those activities merely are incidental to pursuit of interests or performance under a contract in another state. In *Edmunds*, a California limited partnership hired a Hawaii attorney to represent it when the partnership was sued in Hawaii over a lease it held on real property located in Hawaii. During the representation, the attorney came to California to represent the partnership at its deposition, wrote letters and made phone calls from and to California, and received payment for his services from California. When the partnership's limited partners later sued the attorney for malpractice and other claims in California, the attorney moved to quash service of process for lack of personal jurisdiction. The trial court denied the motion and the attorney filed a writ petition challenging the court's order. (*Id*. at pp. 225-228.)

The Court of Appeal granted the petition and directed the trial court to grant the attorney's motion because "[e]verything [the attorney] did was done in his capacity as a Hawaii attorney, and he thus lacks the necessary close relationship to the State of California in these matters to justify the assertion of personal jurisdiction over

13

him." (*Edmunds*, *supra*, 24 Cal.App.4th at p. 236.) As the *Edmunds* court explained, the attorney was licensed to practice law in Hawaii rather than California, and he represented the partnership in Hawaii state court litigation over real property located in Hawaii. "The mere fact[] that to do so, he came to California, made phone calls and wrote letters to and from this state, and accepted payment from a California client, do not establish purposeful availment of the benefits and protections of California law" because the actions were taken to further the attorney's financial interests in his Hawaii law practice and the partnership's financial interests in the Hawaii real property. (*Id*. at pp. 234, 236.)

2.      Cottonwood Did Not Purposefully Avail Itself of Any California Benefits

Cottonwood contends the trial court erred in denying its motion to quash service because Cottonwood did not intentionally engage in any conduct in or directed toward California that purposefully availed it of any California benefits. We agree.

Cottonwood is a Delaware limited liability company with its principal place of business in Utah. It does not have any offices, employees, agents, bank accounts, or assets in California. It is not licensed to do business in California, and although it manages property in nearly 20 states, it never has managed property in California. Cottonwood never has advertised in California or otherwise directed any advertisements toward California residents.

Cottonwood's only contacts with California derive from the Subcontract it entered into with Daymark, which is a California corporation with its principal office in California.[5] Entering into a contract with a California resident, however, is not enough

---

[5]      Owners point out Cottonwood also entered into more than 20 other contracts similar to the Subcontract to manage properties for Daymark in numerous other states. None of these contracts called for Cottonwood to manage property in California. Moreover, in determining whether minimum contacts exist, it is the nature and quality of the contacts that is determinative, not the quantity. (*As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859, 1869 (*As You Sow*).) We therefore focus on the contacts arising from the Subcontract because Owners contend the contacts arising from the other contracts are similar in nature and quality.

14

for a nonresident defendant to purposefully avail itself of California benefits and be subject to specific personal jurisdiction here. (*Aquila*, *supra*, 148 Cal.App.4th at p. 572; *Stone*, *supra*, 76 Cal.App.4th at p. 1048; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 478-479 (*Burger King*).) To determine whether a nonresident's contractual relationship with a California resident constitutes purposeful availment, a court must evaluate the contract's terms and all the surrounding circumstances, including prior negotiations, contemplated future consequences, the parties' course of dealings, and the contract's choice-of-law provision. (*Stone*, at p. 1048; *Burger King*, at pp. 478-479.) "Due process requires a 'substantial connection' between the contract at issue and the forum state." (*Stone*, at p. 1049.)

For example, in *Floyd J. Harkness Co. v. Amezcua* (1976) 60 Cal.App.3d 687 (*Harkness*), a Mexican farmer did not purposefully avail himself of California benefits by entering into a contract with a California corporation because the totality of the circumstances surrounding the contract demonstrated there was no substantial connection to California. (*Id*. at p. 692.) The parties negotiated the contract in Arizona and Mexico, the corporation drafted and signed it in California, and the farmer signed it in Mexico. Under the contract, the farmer agreed to grow vegetables in Mexico and deliver them to the corporation in Arizona, and the corporation agreed to advance the cost of growing the vegetables. To secure each advance, the farmer signed promissory notes in Mexico and delivered them to the corporation's agent in Arizona. The corporation sent the advances from California to the farmer's bank in Arizona, and the notes were payable in California. When the farmer defaulted on the notes, the corporation sued in California and the farmer moved to quash service. (*Id*. at pp. 689-690.)

The trial court granted the motion and the Court of Appeal affirmed, explaining "The acts of making notes executed elsewhere by a nonresident defendant payable to a California resident in California or the acts of making interstate telephone calls relative to the performance of a contract executed outside the state and performed

15

outside the state do not invoke the benefits and protections of our laws." (*Harkness*, *supra*, 60 Cal.App.3d at p. 692.) The court further explained the corporation's activities in California were irrelevant to the question whether California had personal jurisdiction over the farmer because "it is settled that we are not concerned with the performance of the plaintiff in California but exclusively with the nonresident defendant's activities in this state. It is the latter activities which must provide the basis for jurisdiction." (*Id*. at pp. 691-692.)[6]

Here, Cottonwood likewise did not purposefully avail itself of any California benefits by negotiating, entering into, or performing the Subcontract because there is no substantial connection between the Subcontract and California. Cottonwood and Daymark negotiated and entered into the Subcontract in Utah. Owners were not part

---

[6] Owners contend *Harkness* is distinguishable because the *Harkness* plaintiff sought to establish the defendant's purposeful availment based on the plaintiff's rather than the defendant's forum activities. Although the plaintiff may have argued purposeful availment based on its forum contacts, the Court of Appeal did not find a lack of purposeful availment on that ground. Rather, the Court of Appeal properly considered the totality of the circumstances surrounding the parties' contractual relationship to determine whether the defendant had purposefully availed himself of forum benefits. Owners' efforts to distinguish *Harkness* therefore are unpersuasive.

More importantly, Owners support their argument by citing to a California Court of Appeal opinion they acknowledge is unpublished (*Bell v. Li-Huang* (2010) 2010 WL 4720402). Acknowledging the opinion's unpublished status does not make citing it permissible. California Rules of Court, rule 8.1115 prohibits citation to a California Court of Appeal opinion that was not certified for publication even though the opinion is publicly available through online databases. (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1529.) We caution counsel that citation to unpublished opinions may support an award of sanctions, and counsel should refrain from doing so in the future. (See *ibid*.; *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 885.) Indeed, "Counsel would be well served to heed this advice by a leading treatise writer: 'Do not, under any circumstances, cite to an unpublished or depublished opinion (or any unpublished part of a published opinion) . . . unless . . . one of the narrow exceptions to the noncitation rule applies.'" (*Williams*, at p. 1529, italics omitted.)

of those negotiations and they are not parties to the Subcontract.[7] Under the Subcontract, Cottonwood agreed to manage the Georgia apartments for Daymark on a subcontract basis. Cottonwood did not assume any of Daymark's liabilities under the Management Agreement or any contractual obligations to Owners. Indeed, the Subcontract expressly states it is not an assignment of the Management Agreement, and Owners are not third party beneficiaries and are not entitled to "any benefits, rights, privileges, claims, actions, or remedies" under the Subcontract. Cottonwood performed the day-to-day management activities for the apartments in Georgia, and it performed various periodic administrative activities for the apartments at its offices in Utah. It performed no activities relative to the Subcontract in California.

Under the Subcontract, Cottonwood's contacts with California were limited to sending communications about the apartments to a subset of Owners that had members who happened to live in California. The Management Agreement required Daymark to periodically provide Owners with information regarding the apartments and their operations, including an annual budget, an annual operating plan, all information necessary for Owners to prepare their taxes, a report concerning any claims or complaints for damages, and a quarterly financial report. By entering into the Subcontract, Cottonwood agreed to compile this information and communicate it to Owners for Daymark.

Cottonwood did so by compiling the information in Georgia, generating budgets, reports, and other documents at its Utah offices, granting Owners access to these documents via an online database Cottonwood maintained in Utah, and mailing hard copies of the documents from Utah to Owners' members who requested them. Cottonwood also initiated monthly conference calls from Utah to discuss the apartments'

---

[7] Shortly after entering into the Subcontract with Daymark, Cottonwood proposed contracting directly with Owners to manage the apartments, but Owners declined.

17

operations, and it sent Owners e-mails about those calls and other operational issues. In June 2013, Cottonwood sent each Owner a capital call when the revenue from the apartments proved insufficient to cover the operating expenses and service Owners' debt.

Although Cottonwood's communications with Owners about the apartments reached California, Cottonwood did not purposefully seek or receive any California benefits by engaging in those communications. Indeed, much like the insurer's California connections in *Elkman* were not purposeful because the insureds who lived in California moved here after the insurer issued their policies, Cottonwood's California connections were not purposeful because it contracted in Utah to manage the Georgia apartments for Daymark and some members of the Delaware limited liability companies that owned the apartments happened to live here. (See *Elkman*, *supra*, 173 Cal.App.4th at p. 1321.)

Owners' members also happened to live in 12 other states and each of the states where Owners' members lived lacked any direct or substantial connection to the subcontract or Cottonwood's performance under the Subcontract because none of Owners' member lived in either Georgia or Utah. Cottonwood's connection to each state where Owners' members lived therefore was entirely random and coincidental. Cottonwood did not enter into the Subcontract seeking to establish a connection with any of these states.[8] (See *Elkman*, *supra*, 173 Cal.App.4th at p. 1317 [random, fortuitous, or attenuated forum contacts do not establish purposeful availment].)

Moreover, the contacts established through Cottonwood's communications with the handful of Owners' members who lived in California were incidental to the Subcontract's purpose. Daymark did not hire Cottonwood to communicate with Owners'

---

[8]     The presence of more Owners and their members in California than any of the other 12 states does not change the analysis. As explained above, the determinative factor is the quality and nature of the contacts with the forum, not the number. (*As You Sow*, *supra*, 50 Cal.App.4th at p. 1869.)

18

members who lived in California; it hired Cottonwood to manage the apartments in Georgia and keep Owners informed about their upkeep wherever Owners happened to be. California contacts that merely are incidental to a nonresident's performance of a contract outside of California do not establish purposeful availment of California benefits. (*Edmunds*, *supra*, 24 Cal.App.4th at pp. 234-236 [Hawaii attorney who represented California client at deposition in California and sent communications to and from California did not purposefully avail himself of California benefits because activities were incidental to representing client in Hawaii state court litigation over Hawaii real property]; *Harkness*, *supra*, 60 Cal.App.3d at p. 692 [communications to California regarding contract executed and performed outside California did not establish purposeful availment]; see *R.E. Sanders & Co. v. Lincoln-Richardson* (1980) 108 Cal.App.3d 71, 78 [mail and telephone communications to California plaintiff about out-of-state investment did not constitute purposeful availment].)

Finally, the absence of any intent by Cottonwood to purposefully avail itself of California benefits is further demonstrated by the Subcontract's choice-of-law provision and its provision declaring Owners are not third party beneficiaries and have no rights, claims, or remedies under the Subcontract. As stated above, a contract's choice-of-law provision is an important consideration in the purposeful availment analysis because it shows the nonresident intended to purposefully avail itself of the benefits and protections of the designated state's laws. (*Burger King*, *supra*, 471 U.S. at p. 482.) Cottonwood and Daymark's agreement to be bound by Delaware law therefore suggests they did not intend for the Subcontract to have a significant connection with California.[9] (See *Aquila*, *supra*, 148 Cal.App.4th at p. 572.) Similarly, by disclaiming

---

[9] It is interesting to note that Owners repeatedly have agreed that Georgia law should govern disputes about the apartments and they even agreed to submit to personal jurisdiction in Georgia. The documents for Owners' loan on the apartments included a Georgia choice-of-law provision and a submission to personal jurisdiction in Georgia for any dispute about the loan. Similarly, although the Management Agreement

any intent to create rights under the Subcontract in Owners, Cottonwood and Daymark further demonstrated they did not intend Owners or their location to have a role in the enforcement of the Subcontract.

       3.      Owners Failed to Point to Any Aspect of the Subcontract or Cottonwood's Performance That Establishes Purposeful Availment

To meet their burden in opposing the motion to quash, Owners point to various provisions in both the Subcontract and the Management Agreement to show Cottonwood purposefully availed itself of the benefits of conducting activities in California by entering into and performing the Subcontract. Owners, however, misconstrue the governing standards and the agreements.

First, Owners contend Cottonwood purposefully availed itself of California benefits because it created ongoing relationships and assumed continuing obligations with California residents—both Daymark and Owners with members who lived in California—simply by entering into the Subcontract. This argument fails for the reasons already discussed. A nonresident does not purposefully avail itself of California benefits simply by contracting with a California resident (*Aquila*, *supra*, 148 Cal.App.4th at p. 572), and the totality of the circumstances show Cottonwood did not purposefully avail itself of California benefits because the Subcontract was entered into and called for performance outside of California with only incidental California connections (*Edmunds*, *supra*, 24 Cal.App.4th at pp. 234-236; *Harkness*, *supra*, 60 Cal.App.3d at p. 692).

Second, Owners contend Cottonwood purposefully availed itself of California benefits by entering into the Subcontract because the agreement required Cottonwood to perform at least one obligation in California. Owners point to the Management Agreement's provision requiring Daymark to maintain certain records

states any dispute between Owners and Daymark must be arbitrated in California, the Management Agreement also designates Georgia law as the governing law for any dispute under the agreement.

20

regarding Owners' interests in the apartments and to make those records available to Owners at Daymark's office in California. According to Owners, Cottonwood assumed this obligation to maintain records in California by entering into the Subcontract and agreeing to perform all of Daymark's obligations under the Management Agreement. Not so.

The Subcontract states Cottonwood agreed to perform Daymark's obligations under the Management Agreement "except . . . as such terms, covenants, agreements and provisions are specifically modified, excluded or limited by this Subcontract." Elsewhere, the Subcontract states Daymark "will provide all information, books and records for the [apartments] (and for [Owners], to the extent in [Daymark's] possession) to [Cottonwood]. All files [then] shall be kept at the [apartments] or at [Cottonwood's] offices and will be available to [Daymark] and [Owners]." Cottonwood therefore never agreed to maintain any records in California and Daymark's obligation to do so does not establish Cottonwood purposefully availed itself of any California benefits.

Next, Owners point to the arbitration provision in the Management Agreement as evidence Cottonwood purposefully availed itself of the benefits and protections of California law. That provision states Daymark and Owners agreed to submit any dispute relating to the Management Agreement to binding arbitration in Orange County, California. Based on that provision and the Subcontract's provision stating Cottonwood agreed to be bound by Daymark's agreements in the Management Agreement, Owners argue Cottonwood "agreed to litigate any . . . disputes [regarding the Apartment's management] within Orange County, California, thereby invoking the benefits and protections of California law." In making this argument, Owners do not contend the Management Agreement's arbitration provision is enforceable against Cottonwood; rather, they simply argue it is evidence of Cottonwood invoking the benefits and protections of California law when read with select provisions of the Subcontract.

21

We are not persuaded because this contention ignores other provisions defining the limited scope of what Cottonwood agreed to do by entering into the Subcontract.

The Management Agreement authorized Daymark "to subcontract some or all of the property management functions described herein." Consistent with that provision, the Subcontract states Cottonwood "agrees to perform all of [Daymark's] property management obligations under the Management Agreement . . . on a subcontract basis," and "this Subcontract does not constitute an assignment of the Management Agreement." Owners are not parties to the Subcontract, and it expressly states they are not third party beneficiaries and have no "rights, privileges, claims, actions, or remedies" under the Subcontract. The Subcontract does not include an arbitration provision nor does it have a forum selection clause designating Orange County or any other forum. Accordingly, when the two agreements are read together and in their entirety, they show Cottonwood did not agree to litigate any claims in California by entering into the Subcontract, even if the Management Agreement required Daymark to do so.

Owners also cite the Subcontract's indemnity provision as evidence Cottonwood purposefully availed itself of California benefits. In the Subcontract, Cottonwood agreed to defend and indemnify Daymark from any claims or liabilities based on Cottonwood's breach of the Subcontract, and Daymark agreed to defend and indemnify Cottonwood from any claims or liability based on Daymark's breach of the Management Agreement or the Subcontract. According to Owners, any indemnity claims against Cottonwood likely would arise out of litigation commenced in California because Daymark is a California corporation, several of Owners' members reside in California, and the consultant Owners hired to advise them about the apartments resides in California. Similarly, Owners contend any indemnity claim by Cottonwood against Daymark likely would be asserted in California because Daymark is a California corporation. Owners therefore conclude Cottonwood purposefully availed itself of

22

California benefits because it is foreseeable any indemnity claims under the Subcontract would arise in California. We disagree.

Owners' speculation about where indemnity claims under the Subcontract might arise—or even where they might be filed—does not establish personal jurisdiction over Cottonwood. "'Liability and jurisdiction are independent.' [Citation.] 'Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum.'" (*Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 904-905 (*Goehring*).) "Personal jurisdiction must be based on forum-related acts that were personally committed by each nonresident defendant." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 113.) "The purposes and acts of one party . . . cannot be imputed to a third party to establish jurisdiction over the third party defendant" (*ibid.*), not even when the parties are partners (*Goehring*, at pp. 904-905), coconspirators (*Automobile Antitrust Cases*, at p. 113), or parent and wholly owned subsidiary corporations (*Aquila*, *supra*, 148 Cal.App.4th at p. 571).

As explained above, Cottonwood has not committed any forum-related acts that would subject it to personal jurisdiction in California. The Subcontract was negotiated and entered into in Utah and called for Cottonwood's performance in Georgia and Utah. Any claims against Daymark based on Cottonwood's performance therefore would be based on Cottonwood's acts or omissions in Georgia or Utah and would not subject Cottonwood to personal jurisdiction in California even if Daymark sought indemnity from Cottonwood in California. Similarly, Daymark's status as a California corporation does not mean Cottonwood must seek indemnity from Daymark in California, and Daymark's California connections cannot be attributed to Cottonwood. Owners fail to identify any act by Cottonwood relating to the indemnity provision in the Subcontract that would subject Cottonwood to personal jurisdiction in California.

23

Next, Owners contend Cottonwood purposefully availed itself of the benefits and protections of California law by filing a UCC Financing Statement with the California Secretary of State to perfect the security interest the Subcontract granted Cottonwood in Daymark's right to payment under the Management Agreement. Owners are mistaken. A nonresident's use of a California procedure to protect its security interest under a contract entered into and requiring performance in another state does not amount to purposeful availment of California benefits. Indeed, several courts have rejected this same contention because "'[t]he filing of financing statements is not akin to soliciting business in the forum, introducing products into the forum, or signing and performing a contract within the forum.'" (*Goehring*, *supra*, 62 Cal.App.4th at p. 908.)

Finally, Owners contend that if these California connections individually are not sufficient to establish purposeful availment, they are sufficient when they are considered collectively. Again, we disagree. None of the individual contacts Owners rely on establish any connections with California. It therefore follows logically that no California connection is shown when those factors are considered as a whole.

Because we conclude Owners failed to meet their burden to establish purpose availment, "it is unnecessary to address the other prerequisites for the exercise of specific jurisdiction over a nonresident defendant, i.e., whether the controversy is related to or arises out of the defendant's contacts with the forum, and whether the assertion of personal jurisdiction would comport with fair play and substantial justice." (*Elkman*, *supra*, 173 Cal.App.4th at p. 1321; see *Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1062.)

DISPOSITION

The petition for writ of mandate is granted. Let a peremptory writ of mandate issue directing the respondent court to vacate its order denying Cottonwood's

24

motion to quash service of process and enter a new order granting the motion. Cottonwood shall recover its costs for the proceedings in this court.

ARONSON, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.